IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ALEC McCARTHY                                                                              PLAINTIFF

V.                                    CASE NO. 5:24-CV-5010

CALVARY BAPTIST MINISTRIES, INC.;
CALVARY INDUSTRIES, INC. d/b/a
CALVARY CANDLES; and JOHN DOES 1–10                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Presently before the Court are three motions for summary judgment: Defendants Calvary Industries and Calvary Baptist Ministries' Motion for Summary Judgment (Doc. 33); Calvary Baptist Ministries' Motion for Summary Judgment (Doc. 40); and Calvary Industries' Motion for Summary Judgment (Doc. 45). The Motions are fully briefed and ready for review by the Court.

### I. BACKGROUND

Plaintiff Alec McCarthy brought this case on January 16, 2024, alleging various tort claims.[1] Plaintiff was thirteen when he first arrived at Calvary Baptist Ministries' ("CBM") Boys Ranch—a Christian boarding school for boys in Oklahoma—in 2012. He remained at the Ranch until mid-2016. Plaintiff alleges that during this time he was sexually abused by two adult staff members who worked for CBM, as well as by other boys at the Ranch. Defendants deny that any abuse took place, but whether such abuse occurred is not the subject of the pending Motions. Rather, Defendants assert that Plaintiff's claims are

---

[1] Plaintiff pleaded the following in the Complaint: Count One – Negligence; Count Two – Negligent Supervision; Count Three – Negligent Retention; Count Four – Battery (Vicarious Liability); Count Five – Tort of Outrage; Count Six – Vicarious Liability for Negligent or Otherwise Tortious Acts and Omissions of All Agents and Employees; Count Seven – Civil Action by a Crime Victim. *See* Doc. 2.

1

barred by the statute of limitations (Doc. 33), CBM argues it is protected by charitable immunity (Doc. 40), and Calvary Industries argues it owed no duty to Plaintiff and did not cause Plaintiff's injuries (Doc. 45). The following is undisputed unless otherwise indicated.

CBM is a not-for-profit ministry whose purpose includes, "[e]vangelizing the unsaved through worship evangelistic services, training and educational ministries" and "[p]rovid[ing] Christian education by making available, when possible, Christian schools, Bible Institutes, Bible Colleges and Seminaries." (Doc. 40-1, pp. 65, 68 (Certificate of Incorporation & Constitution and By-Laws)). According to current head administrator Cambrin Collins,[2] CBM's Boys' Ranch was a Christian boarding school started in 1977 by founder Jerry McDonald, Sr. to provide "spiritual help" to boys who were struggling and needed "a place that could provide them with . . . structure and . . . discipline." *See id.* at pp. 7–17 (Collins. Depo.). At the time of incorporation, the directors and incorporators of CBM were Jerry McDonald Sr., his son, Jerry McDonald, Jr., and Tim Knight. *Id.* at p. 66. McDonald, Sr. served as the head administrator, known as the Director, until his death in 2012; his son then took over until 2021, when Collins took over. (Doc. 40-1, p. 63 (CBM Brochure)). The Ranch remained in operation until 2016. *Id.* at p. 7 (Collins Depo.).

The Ranch usually had around twenty to forty boys at a time. (Doc. 53, p. 3 (Collins Depo.)). All the boys slept in a single open dorm, (Doc. 45-2, p. 48), which is where Plaintiff alleges some of the sexual abuse occurred, *see* Doc. 2, ¶¶ 45–47. In addition to contributions and donations—which could make up over 40% of CBM's annual revenue— CBM also relied on "Fund Raising Income" for approximately 30% of its annual revenue.

---

[2] Collins explained in his deposition that CBM's head administrator is equivalent to a CEO-type position. (Doc. 56-1, p. 2 (Collins Depo.)).

*See* Doc. 53, pp. 5–16. Plaintiff contends, and the evidence supports, that this fundraising income came from candle sales, whereby the children from the Boys Ranch and adult men from another of CBM's ministries called the City of Refuge—a six-month program to help adult men recovering from addiction—would go out and sell candles. *See* Doc. 40-1, p. 52 (Collins Depo.); Doc. 56-3, p. 4 (Jeremy Beller Depo.).[3]

It appears the boys went on weekly candle-selling trips, and it is on these trips that Plaintiff alleges he was sexually assaulted by Jon Ellison, a staff member with CBM.[4] Plaintiff asserted in his deposition that he sold candles from approximately 9 AM to 5 PM at least two days per week, sometimes three days per week, every week. *See* Doc. 53, p. 31 (McCarthy Depo.); *id.* at p. 23 (Collins Depo.) (stating candle selling happened on a weekly basis). Plaintiff believes that all the boys at the Ranch sold candles this frequently as well. *Id.* at p. 31 (McCarthy Depo.). In addition to the weekly sales, the boys sometimes went on week-long fundraising trips in various states where they would sell candles from 9 AM to 5 PM and stay in hotels overnight. *Id.* at p. 27 (McCarthy Depo.). Sometimes the boys received incentives for whoever sold the most candles, such as

---

[3] Beller is one of the adult staff members Plaintiff accuses of abuse. In his Complaint, Plaintiff alleges that Beller would openly masturbate in the open dorm in front of the minor boys; that when CBM found out, it sent Beller to the City of Refuge program then allowed him to return to work at the Boys Ranch; that when Beller continued to masturbate in front of the boys, CBM again sent Beller to the City of Refuge and then back to work at the Boys Ranch. *See* Doc. 2, ¶¶ 45–46. There is evidence in the record that Beller attended the City of Refuge program, during which time he worked making candles for Calvary Industries. (Doc. 56-3, p. 2 (Beller Depo.)). Beller also explained in his deposition certain rules pertaining to candle sales: "[I]f at all possible, . . . they tried to keep the men and the boys not even sitting next to each other. . . . [T]hey were not allowed to have, you know, personal conversations, contact. . . . [A]s an older guy, you would get in big trouble talking to a younger guy and vice versa." *Id.* at p. 4.

[4] Ellison had previously been in the City of Refuge program as well. (Doc. 56-2, pp. 2–3 (Ellison Depo.)).

going to Silver Dollar City or having a steak dinner. *Id.* at pp. 29–30. And the candle sales appeared to have been lucrative: Plaintiff's top-earning day was $3,200 and he had multiple $2,000 days. *Id.* at p. 30; *see also id.* at p. 9 (showing that CBM made $414,547.78 in "Fund Raising Income" in 2014). The boys were not paid for selling the candles. *Id.* at p. 23 (Collins Depo.).

Other than the candle sales, CBM reported revenue from various forms of contributions, including from the boys' parents and from the men attending the City of Refuge program. *See id.* at pp. 5–16 (listing "Contributions-Parents" and "Contributions-City/Refuge" as income each year, sometimes as much as $143,494.61). The parties dispute whether the parents' contributions were mere donations or whether they constituted tuition payments. Either way, it appears Plaintiff's parents agreed to pay $500 on or before the 10th of every month for him to attend the program. *Id.* at p. 18 (McCarthy's Application). Parents were also responsible for their child's expenses like medical care and telephone calls—the parents could call their sons for ten minutes at a time on the singular phone line at the dorm. (Doc. 45-2, pp. 37, 40).

According to a document simply titled "Calvary Church Ministries Financial Information," CBM appears not to have mandated payment from parents but asked them to donate the amount required to support their child. (Doc. 59-2, p. 1). It states: "We simply ask parents to tell us honestly, before God, what they can send each month, then that is the amount we expect each month." *Id.* Collins claims that CBM would "not charge anyone for its services" and that they would serve those who are unable to pay. (Doc. 40-1, pp. 42–43 (Collins Depo.)). Indeed, there is evidence in the record of two men who applied

4

and were accepted to the City of Refuge, even though their applications indicated inability to pay. (Docs. 59-3 & 59-4).

CBM's financial statements show those running the ministry were paid relatively low salaries. *See, e.g.*, Doc. 53, p. 9 (showing in 2014, Collins making $12,720, McDonald, Jr. making $13,597). It also appears various family members received similar salaries. *See, e.g.*, *id.* (showing in 2014, Jan McDonald making $21,995, Julie McDonald making $13,780, Jenny McDonald making $3,180, Sherry Knight making $7,420, Leah Collins making $7,420, and Jennifer Collins making $2,650). In addition to receiving salaries, food and lodging was covered for these persons. *Id.* at p. 20 (McDonald, Jr. Depo.). Indeed, for several years McDonald, Jr. and Knight each received approximately $10,000 to $12,000 per year towards their housing. *Id.* at pp. 5–16. And in 2014, the Director—at the time, McDonald, Jr.—received $6,359.50 towards his retirement from CBM. *Id.* at p. 10. CBM also regularly spent between $75,000 and $133,000 per year on "Fund Raising Expenses." *Id.* Conversely it spent very little on medical expenses, approximately $140 to $1,000 per year, except in 2012 when it spent $31,000. *Id.* Additionally, CBM spent tens of thousands of dollars on expenses with an unclear relation to the charitable work at either the Ranch or the City of Refuge, including frequently spending over $70,000 per year on childcare, up to $60,000 per year on gasoline, and $20,000 per year on telephone charges. *See, e.g.*, *id.* at p. 5.

Calvary Industries is a separate for-profit corporation that CBM created in 2002 to assist in its ministry by providing candles to CBM wholesale for its fundraising activities and providing minimum wage jobs to the City of Refuge men making the candles. *See* Doc. 56-1, p. 5 (Collins Depo.); Doc. 56-5, p. 19. CBM owns 100% of Calvary Industries'

voting stock, and for awhile, McDonald, Jr. and Knight served as the President and Secretary/Treasurer, respectively. (Doc. 53, pp. 41, 54). Since then, Collins has taken over as President. (Doc. 56-4, p. 1). Collins's father, Dale Collins, served as both the manager of Calvary Industries and the director of City of Refuge (Doc. 56-1, p. 2 (Collins Depo.)). In fact, Dale Collins hired Ellison to work for Calvary Industries while Ellison was in the City of Refuge program. (Doc. 56-2, p. 3 (Ellison Depo.)). Calvary Industries also appears to make relatively little profit. *See* Doc. 60-1 (showing net income ranging from of -$3,009.48 to $33,863.97 between 2019 and 2023). Calvary Industries is located on the same property where the Boys Ranch and City of Refuge are located, within close walking distance. (Doc. 56-3, p. 2 (Beller Depo.)). And Calvary Industries pays tens of thousands of dollars in rent each year, presumably to CBM. *See, e.g.*, Doc. 56-5, p. 3 (showing $46,140 paid in rent in 2019).

## II. LEGAL STANDARD

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court must view the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

## III. STATUTE OF LIMITATIONS (DOC. 33)

Defendants move for summary judgment on the basis that the applicable statute of limitations has expired in this matter. There is no dispute that without some tolling provision or extension, the statute of limitations in this case would have expired in August 2020, three years after Plaintiff's eighteenth birthday. Ark. Code Ann. §§ 9-25-101 (age of majority), 16-56-105 (three-year statute of limitations), 16-56-116(a) (minor at time of accrual of action).  Plaintiff, however, relies on two provisions to extend or toll the statute of limitations: (1) the "delayed discovery statute," Ark. Code Ann. § 16-56-130; and (2) the "Justice for Vulnerable Victims of Sexual Abuse Act" ("Victims Act"), Ark. Code Ann. § 16-118-118. Plaintiff's primary argument is that the delayed discovery statute tolled the statute of limitations such that his claims were not yet time-barred when the Victims Act took effect and, therefore, fall within the Victims Act's ambit.

The delayed discovery statute provides that a claim "based on sexual abuse which occurred when the injured person was a minor but is not discovered until after the injured person reaches the age of majority shall be brought within three (3) years from the time of discovery of the sexual abuse by the injured party." Ark. Code Ann. § 16-56-130(a). The statute defines "[t]ime of discovery" as "when the injured party discovers the effect of the injury or condition attributable to the childhood sexual abuse." Ark. Code Ann. § 16-56-130(c)(3). According to Defendants, Plaintiff "'discovered' the effects of his injury by March of 2020 and thus had to file his claim on or before March of 2023 in order to satisfy this provision." (Doc. 34, pp. 4–5, 10–13). Plaintiff argues that he did not discover the effects of his abuse until at least the spring of 2022—less than two years before suit was filed—making the action timely under § 16-56-130. Nevertheless, Plaintiff's primary

argument is that even if the statute of limitations expired in March 2023, his claims are still timely under the Victims Act.[5]

The Victims Act became effective in July 2021 and was amended in 2023. It set out to give minors and disabled persons who experienced sexual abuse more time to sue the persons responsible for that abuse. Subsection (b)(1) provides:

> Notwithstanding any other statute of limitation or any other law that may be construed to reduce the statutory period set forth in this section, a vulnerable victim may bring a civil action against any party who committed sexual abuse against the vulnerable victim or whose tortious conduct caused the vulnerable victim to be a victim of sexual abuse.

Ark. Code Ann. § 16-118-118(b)(1). The more controversial provision, found at subsection (b)(2), operates as a "Revival Window" and provides:

> Notwithstanding any other statute of limitation or any other law that may be construed to reduce the statutory period set forth in this section, a civil action similar to a civil action described in subdivision (b)(1) of this section, including a cause of action arising before, on, or after July 28, 2021, that was barred or dismissed due to a statute of limitation is revived, and the civil action may be commenced not earlier than six (6) months after and not later than thirty (30) months after August 1, 2023.

Ark. Code Ann. § 16-118-118(b)(2).

Defendants argue that Plaintiff seeks to revive time-barred claims under § 16-118-118(b)(2), as the Victims Act went into effect more than three years after his eighteenth birthday. According to Defendants, the Arkansas Court of Appeals, and the Eastern

---

[5] Defendants seem to argue that Plaintiff discovered the effects of his injury on *or before* March 18, 2020, but they present no evidence to support that his discovery was prior to March 2020. They also state in their briefing that the evidence here "*confirms* that McCarthy discovered the effects of his alleged injuries or condition *in March 2020*." (Doc. 34, p. 13 (emphasis added). Therefore, the Court does not consider there to be a genuine issue of material fact that his discovery occurred before March 2020. To the extent there is a dispute of fact here, it is whether the discovery occurred in March 2020 or in the spring of 2022—as Plaintiff asserts. But such dispute is not material because, even with a discovery in March 2020, the suit is still timely.

8

District of Arkansas, the Revival Window is invalid because it violates a defendant's vested right to rely on a statute of limitation as a defense. *See H.C. v. Nesmith*, 2025 Ark. App. 59 (2025); *Does 1, 2, 4, 5, 6 & 8 v. Presley*, 772 F. Supp. 3d 1031 (E.D. Ark. 2025). But Defendants gloss over Plaintiff's argument that he does not need the Revival Window because his claims were *not* time-barred when the Act took effect.

Plaintiff argues that he has "no need for the Revival Window" because the delayed discovery statute tolled the statute of limitations until at least March 2023—i.e., three years after Defendants assert he discovered the effects of his abuse—so "Defendants' so-called right to rely on the expiration of a statute of limitations had not yet vested" and his claims were not barred when the Victims Act took effect in July 2021. (Doc 38, p. 2). Thus, according to Plaintiff, § 16-118-118(b)(1) applies in his case and removes any statute of limitations from his claims.

The Court agrees with Plaintiff here and finds that his claims are not time-barred. Defendants are correct that the Arkansas Supreme Court has "long taken the view" that "the legislature cannot expand a statute of limitation so as to revive a cause of action already barred." *Johnson v. Lilly*, 308 Ark. 201, 203 (1992) (citations omitted). However, the Arkansas Supreme Court has also "long held that the legislature has the power to amend statutes of limitation affecting causes of action *which are not yet barred*." *Id.* (citations omitted). In other words, the legislature "may retroactively increase the length of a statute-of-limitations period to cover claims already in existence," so long as the claim is not already time-barred. *Hall v. Summit Contractors, Inc.*, 356 Ark. 609, 613 (2004); *Chunn v. D'Agostino*, 312 Ark. 141, 142–43 (1993); *see also Miller v. Subiaco Academy*, 386 F. Supp. 2d 1025, 1029 (W.D. Ark. 2005).

9

This case is distinct from *Nesmith* where it was "undisputed" that the "claims were time-barred before the Act's enactment," including being barred under the delayed-discovery statute, and it is distinct from *Presley* where the plaintiffs "did not allege tolling, plead facts about a delayed discovery of injury, or rely on Arkansas's delayed-discovery statute." *Nesmith*, 2025 Ark. App. 59, at 2, 4 n.2; *Presley*, 772 F. Supp. 3d at 1033. Here, *Defendants* assert that Plaintiff discovered the effects of the abuse in March 2020, thereby tolling the applicable statute of limitations to March 2023. Thus, even under Defendants' version of the facts, Plaintiff's claim was "not yet barred" when the Victims Act took effect in July 2021, so "the legislature ha[d] the power," *Johnson*, 308 Ark. at 203, to "retroactively increase the length of [the] statute-of-limitations period," *Hall*, 356 Ark. at 613. For the above reasons, the Court finds that Plaintiff's claim is timely. Defendants' Motion (Doc. 33) is **DENIED**.

### IV. CBM'S LIABILITY – CHARITABLE IMMUNITY (DOC. 40)

CBM moves for summary judgment on its affirmative defense that it is charitably immune from suit under Arkansas law. Plaintiff rejects this, arguing CBM has failed to prove it is entitled to immunity as a matter of law.

#### A. Law

For over a century, the Arkansas Supreme Court has recognized the doctrine of charitable immunity. *Davis Nursing Ass'n v. Neal*, 2019 Ark. 91, at 5 (2019) (citing *Low v. Ins. Co. of N. Am.*, 364 Ark. 427 (2005), for its discussion of the history of the doctrine). "The essence" of this doctrine "is that organizations such as agencies and trusts created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust."

*Id.* (citing *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206 (1999)). Charitable immunity provides immunity not only from liability but from suit. *Id.* (citation omitted). Because charitable immunity "results in a limitation of potentially responsible persons whom an injured party may sue," courts give it "a narrow construction." *Id.* (citing *Williams v. Jefferson Hosp. Ass'n*, 246 Ark. 1231 (1969)).

Courts consider eight factors in determining whether an organization is entitled to charitable immunity. The factors are "illustrative, not exhaustive, and no single factor is dispositive." *Id.* (citation omitted). The eight factors are:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its service free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Masterson v. Stambuck*, 321 Ark. 391, 401 (1995). Courts in Arkansas have also considered the "pivotal issue" of "whether the charitable form has been abused." *Watkins v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, at 12 (2012).

The "recurring theme is that to be immune from tort liability an organization must be created and maintained exclusively as a charity"—even where an organization's "stated purpose[ ] [is] noble and exclusively for charity," it must be "maintained for [that] stated purpose." *J. W. Resort, Inc. v. First Am. Nat. Bank*, 3 Ark. App. 290, 292–93 (1981); *Masterson*, 321 Ark. at 402 ("recogniz[ing] and adopt[ing] the position taken [in *J.W.*

11

*Resort, Inc.*] that, unless an entity performs as its articles state, it will not be entitled to charitable immunity").[6]

When there are disputed facts regarding an organization's charitable status, such facts "may be presented to a jury," after which the court will determine whether those facts establish charitable immunity. *Davis Nursing Ass'n*, 2019 Ark. at 6 (citing *Anglin v. Johnson Reg'l Med. Ctr.*, 375 Ark. 10, 21 (2008)). However, if there are no disputed facts—only differing legal interpretations of undisputed facts—charitable status is a question of law. *Id.* (citation omitted). As the party asserting this affirmative defense, CBM bears the burden of pleading and proving that it is entitled to charitable immunity. *Downing v. Lawrence Hall Nursing Ctr.*, 2010 Ark. 175, at 10 (2010) (citations omitted).

## B. Discussion

Plaintiff challenges the third, fourth, sixth, seventh, and eighth *Masterson* considerations. Plaintiff also argues that CBM was so interrelated with Calvary Industries, a for-profit company, that it cannot benefit from charitable immunity here. (Doc. 52, p. 11 (citing *Watkins*, 2012 Ark. App. 301, at 12, and *Arkansas Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, at 8 (2012)).

Admittedly, CBM has presented evidence to support each of the challenged considerations. *See* Doc. 40-1, pp. 42–43 (Collins Depo.) (stating CBM's goal was to break even, not to profit); *id.* at pp. 51–52 (asserting CBM depends on donations for its existence); *id.* at p. 53 (stating people are not turned away if unable to pay); *id.* at p. 43

---

[6] CBM is correct in its contention that the Arkansas Supreme Court has applied this doctrine to a church, i.e., an "eleemosynary or religious institution." *LeMay v. Trinity Lutheran Church*, 248 Ark. 119, 120 (1970). In *LeMay*, there was "no allegation in the complaint that the activities of [the church were] other than religious activities"; such allegations are present here. *Id.* at 121.

12

(stating the employees and staff are paid "menial salaries"); Doc. 53, pp. 5–16 (CBM's financial statements showing it frequently operated at a loss, that over 40% of its revenue came from donations, and that CBM paid small salaries); Docs. 59-3 & 59-4 (applications to City of Refuge for two men unable to pay and the dates they entered the program). But that is not the whole story here: the evidence of record also raises questions of fact that—depending on the answer—could show that CBM was not being maintained for a charitable purpose.

There is evidence from which one could reasonably infer that, despite not making a large profit or providing high compensation, CBM used its revenue to fund the lifestyles of the people operating it. For example, in many years, CBM spent over $70,000 in childcare expenses, but it is not at all clear whose children this benefitted; it seems unlikely it would be the boys at the Ranch or the men at the City of Refuge, and one could reasonably infer it paid the childcare expenses for the families running CBM. Additionally, the medical expenses most years were surprisingly low, ranging from approximately $140 to just over $1,000—likely because the boys' families were responsible for their child's medical expenses. But, in 2012, the year Jerry McDonald, Sr. passed away, CBM spent over $31,000 in medical expenses. And there are various other large expenses that raise questions, considering the modest accommodations provided to the boys—e.g., annual telephone expenses over $20,000 when the boys shared one phone and their parents had to pay for calls, or annual gas expenses over $60,000. Thus, despite low profits and menial compensation, there is a genuine question of fact as to whether the money here was used for charitable purposes or primarily to support those running CBM. *See supra* Section I.

There is also evidence that a significant portion of CBM's revenue came from the boys selling candles and parents paying for their children's care. Indeed, one could reasonably infer that more than 30% of the annual revenue came from the boys selling candles, which the evidence supports they did two to three days each week for eight hours per day in addition to week-long fundraisers. The evidence supports that these sales were lucrative for CBM—with Plaintiff selling up to $3,200 worth of candles in one day—and that the boys were incentivized to make sales through rewards like steak dinners. Of course, the boys did not receive pay for the hours they spent selling candles; the money went to CBM. *See* Doc. 53, p. 29 (McCarthy Depo.) ("I made the ranch a lot of money."); *supra* Section I.

Further, CBM's financial statements may not tell the whole story about how much money people like Knight and McDonald, Jr. were making from the boys' candle sales. If "Fund Raising Income" represents candle sales, one could reasonably infer that "Fund Raising Expenses" represents candle purchases from Calvary Industries, which was also run by Knight and McDonald, Jr. *See* Doc. 53, p. 54. These expenses sometimes reached over $130,000 in a single year, despite Calvary Industries only paying the men making the candles minimum wage. *See id.* at p. 6. If Knight and McDonald, Jr. were profiting from the boys' sales more than what is reflected in CBM's financial statements, that would go to whether CBM was being maintained for a charitable purpose. *See supra* Section I.

There is also evidence that at least some parents agreed to pay a set monthly amount in exchange for CBM's services to their child. And to the extent CBM offered services for free to those unable to pay, these services were still supported by the unpaid labor of the purported beneficiaries. *See* Doc. 40-1, pp. 42–43 (Collins Depo.) (explaining

14

the fundraising money went towards providing services for those who could not pay or could pay very little); *supra* Section I.

Neither the parties nor the Court could identify a factually analogous case on this matter. Charitable immunity cases typically involve hospitals and nursing homes, where application of the *Masterson* considerations is influenced by features such as the organization's complexity, modernity, and need to compete for highly skilled persons. That factual context simply is not present in the case at bar, thereby limiting the applicability of the bulk of the case law on this issue. Of course that does not inherently exclude CBM from such immunity, but the issues of fact regarding CBM's operation and purpose further distinguish it from much of the available case law. For example, a hospital's capacity to meet the seventh consideration far outweighs what we see here: the hospitals in the relevant case law often provide free medical services to those unable to pay to the tune of hundreds of thousands or even millions of dollars. *Anglin*, 375 Ark. at 16; *Jackson v. Sparks Reg'l Med. Ctr.*, 375 Ark. 533, 540 (2009).

Additionally, on some of the considerations, the Arkansas Supreme Court seems to cut hospitals slack due to hospitals' inherent qualities. For example, with regard to the sixth consideration, the fact that a hospital "receives most of its funding through sources other than contributions or donations does not 'negate its overriding charitable purpose'" because "a modern hospital, with rare exception, would find it extremely difficult to operate wholly or predominately on charitable donations." *Jackson*, 375 Ark. at 541 (quoting *George v. Jefferson Hosp. Ass'n, Inc.*, 337 Ark. 206, 214 (1999)). The court in *Jackson* also noted that most of the hospitals' funding came through Medicare, Medicaid, and individual patients or their private insurers. *Id.* Similarly in *Jackson* and *George*, the

15

Arkansas Supreme Court concluded that although the hospitals' executives were compensated, that did not tilt the scales away from charitable immunity because a hospital's "size and complexity make knowledgeable, well-qualified personnel essential" and "[s]uch persons do not readily volunteer their services or serve at rates of compensation markedly lower than market rates." *George*, 337 Ark. at 214; *Jackson*, 375 Ark. at 541. So, for those hospitals, "minimal bonus compensation to officers and directors [did] not put the hospital in the position of being maintained for the private gain, profit, or advantage of its organizers." *George*, 337 Ark. at 214; *Jackson*, 375 Ark. at 541.

The case at bar is unlike *Anglin* or *Jackson* where the hospital provided hundreds of thousands to millions of dollars in free healthcare because, here, there is evidence that those individuals' expenses may have been covered—at least in part—by their own work selling candles. Additionally, this case lacks the context that has dictated leniency on certain *Masterson* considerations in cases like *Jackson* and *George*. For example, there is no evidence that CBM has any of the features of a large, modern hospital, that its alternative funding comes from social programs like Medicare and Medicaid, or that the compensation provided by CBM can be justified by a need to compete for skilled individuals (indeed, it is not even clear here exactly how much the compensation was).

Fact questions remain at this point that the Court is not suited to answer, namely: Was CBM maintained exclusively for a charitable purpose or was it "maintained for the private gain, profit, or advantage of its organizers?" *George*, 337 Ark. at 214

Four concepts are working in Plaintiff's favor here, two substantive and two procedural: (1) the *Masterson* considerations are only illustrative; (2) Arkansas courts give charitable immunity a narrow construction; (3) CBM bears the burden of proving it is

entitled to the affirmative defense; and (4) at the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant. So, the Court finds on this record CBM has not shown as a matter of law that it is entitled to charitable immunity. CBM's Motion (Doc. 40) is **DENIED**.

## V. CALVARY INDUSTRIES' LIABILITY – JOINT VENTURE (DOC. 45)

Whether Calvary Industries can be liable hinges on whether it formed a joint venture with CBM, such that it can be held vicariously liable for CBM's acts.

The Arkansas Supreme Court has explained that "[j]oint venturers may be held jointly and severally liable for one another's wrongful acts," so long as the joint venture has "the elements of a partnership." *Nat'l Bank of Com. (of El Dorado) v. HCA Health Servs. of Midwest, Inc.*, 304 Ark. 55, 59 (1990) (first citing *Myers v. Lillard*, 215 Ark. 355 (1949), and then citing *State ex rel. Attorney General v. Gus Blass Co.*, 193 Ark. 1159 (1937)); *see also Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2014 WL 348592, at *2 (W.D. Ark. Jan. 31, 2014), *aff'd*, 576 F. App'x 647 (8th Cir. 2014*)* (quoting *Nat'l Bank of Com. (of El Dorado)*, 304 Ark. at 59).

"A joint venture exists when persons jointly seek a profit in a specific venture without actual partnership or corporate designation." Howard W. Brill, Arkansas Law of Damages § 15:4, n.13 (citing *Slaton v. Jones*, 88 Ark. App. 140 (2004)). "Joint ventures are not established by operation of law but by contracts, expressed or implied, between the parties." *Tackett v. Gilmer*, 245 Ark. 689, 694 (1973) (citation modified). "[L]iability of a joint venturer is vicarious, founded on principles of agency." *Nat'l Bank of Com. (of El Dorado)*, 304 Ark. at 59. The party asserting the existence of a joint venture bears the

burden of showing the relationship. *Burge*, 301 Ark. at 536 (citing 46 Am. Jur. 2d, Joint Ventures § 69 (1969)).[7]

For a business enterprise to constitute a joint venture, the following three elements must be established: (1) two or more persons combine in a joint business enterprise for their mutual benefit; (2) right of mutual control of management of the venture; and (3) an expressed or implied understanding that they are to share in the profits or losses of the venture. *Hotel Assocs., Inc. v. Rieves, Rubens & Mayton*, 2014 Ark. 254, at 9 (2014) (citations omitted); *Tackett v. Gilmer*, 254 Ark. 689, 691–93 (1973) (citations omitted); *First Nat. Bank at Paris v. Adair*, 42 Ark. App. 84, 87 (1993); *see Kolbek*, 2014 WL 348592, at *2 (quoting *Burge v. Pack*, 301 Ark. 534, 536 (1990)); Brill, Arkansas Law of Damages § 15:4, n. 13 (citation omitted).[8] Usually, "the existence or nonexistence of the elements necessary to establish a joint venture . . . is a question of fact," unless "no competent evidence supports a finding of a joint venture." 46 Am. Jur. 2d, Joint Ventures § 75.

Here, the record shows that CBM and Calvary Industries were entangled in a variety of ways: CBM owned Calvary Industries; it created Calvary Industries to further its own mission; Calvary Industries employed men in the City of Refuge program, aiding in

---

[7] Calvary Industries seems to suggest that, even if there were a joint venture, Plaintiff would also need to prove Calvary Industries caused the injury. This argument is unavailing. As explained in the case law described in this Order, a joint venture creates vicarious *liability*, not merely the imputation of duty and breach.

[8] Plaintiff relies on several cases where only the first two elements have been applied, frequently in the context of car wrecks or similar accidents. *See, e.g.*, *Yant v. Woods*, 353 Ark. 786 (2003); *Hurley v. Peebles*, 238 Ark. 739 (1964); *Lovell v. Brock*, 330 Ark. 206 (1997); *RLI Ins. Co. v. Coe*, 306 Ark. 337 (1991). *C.f. Slaton v. Jones*, 88 Ark. App. 140 (1997). Where, as here, the case revolves around a business enterprise, the Court believes following more on-point cases like *Tackett*, and including the third element, is most prudent.

providing the structure and discipline CBM sought to create; Calvary Industries was run and controlled by the very people that ran and controlled CBM, including the McDonalds and the Collinses; CBM relied on the candles made by Calvary Industries and the City of Refuge men, and Calvary Industries relied on the unpaid work of CBM boys and residents selling the candles; and the Court has some concerns as to the reality of the flow of money between the two organizations. When giving Plaintiff the benefit of all reasonable inferences—as the Court must do at summary judgment—it finds there is a genuine issue of material fact as to whether there was a joint venture. Because the Court lacks the certainty necessary to grant judgment as a matter of law, it will follow the ordinary course and ask a jury to determine the existence or nonexistence of the necessary elements. Therefore, Calvary Industries' Motion for Summary Judgment (Doc. 45) is **DENIED**.

## VI. CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on the basis of statute of limitations (Doc. 33) is **DENIED**; CBM's Motion for Summary Judgment on the basis of charitable immunity (Doc. 40) is **DENIED**; and Calvary Industries' Motion for Summary Judgment asserting it cannot be held liable (Doc. 45) is **DENIED**.

**IT IS SO ORDERED** on this 27th day of August, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE